UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

AMY McCONNELL and AMY
McCONNELL on behalf of her
four minor children, A.B.,
A.B. J.M. and J.M.,

        NO. CIV. S-05-0909 FCD DAD

     Plaintiffs,

   v.                  <u>MEMORANDUM AND ORDER</u>

LASSEN COUNTY, CALIFORNIA,
et al.,

     Defendants.
_____/

----oo0oo----

    This matter comes before the court on defendants Lassen
County (the "County"), Terry Chapman ("T. Chapman"), Loel
Griffith ("Griffith"), Jack Hanson ("Hanson"), Brian Dahle
("Dahle"), Lloyd Keefer ("Keefer"), Bob Pyle ("Pyle"), James
Chapman ("J. Chapman"), and Environmental Alternative's ("EA")

///
///

motions[1] for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  For the reasons set forth below,[2]

defendants' motions are GRANTED in part and DENIED in part.

### BACKGROUND[3]

This case arises out of the placement of the minor

plaintiffs A.B., A.B., J.M., and J.M. in protective custody by

Lassen County Child Protective Services ("CPS") and the

---

[1]     Defendants filed four separate motions for summary judgment.  However, the court addresses all motions for summary judgment herein.

[2]     Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs.  See E.D. Cal. L.R. 78-230(h).

[3]     Unless otherwise noted, the facts herein are undisputed.  (See Pls.' Am. Objection to Def. Board's Stmt. of Undisp. Facts ("BUF"), filed May 22, 2007; Pls.' Am. Objection to Def. Griffith's Stmt. of Undisp. Facts ("GUF"), filed May 23, 2007; Pls.' Am. Objection to Def. T. Chapman and Lassen County's Stmt. of Undisp. Facts ("TUF"), filed May 22, 2007; Def.'s Reply to Pls.' Am. Objection to Def. EA's Stmt. of Undisp. Facts ("EUF"), filed June 1, 2007.  Where the facts are in dispute, the court recounts plaintiffs' version of the facts.  Plaintiffs have filed documents purporting to set forth undisputed facts in support of her oppositions.  The court construes these filings as statements of disputed facts pursuant to Local Rule 56-260(b). (See Pls.' Am. Stmt. of Undisp. Facts in Supp. of Pls.' Objection to Def. Board's Mot. ("BDF"), filed May 22, 2007; Pls.' Stmt. of Undisp. Facts in Supp. of Pls.' Objection to Def. T. Chapman and Lassen County's Mot. ("TDF"), filed May 21, 2007; Pls.' Stmt. of Undisp. Facts in Supp. of Pls.' Objection to Def. EA's Mot. ("EDF"), filed May 22, 2007).

Plaintiffs assert that many facts are disputed, but their proffered evidence does not contradict defendants' assertions. Therefore, where plaintiffs fail to point to any contrary evidence or direct contradictions in defendants' own statements, the court will not consider such facts to be in dispute.

Defendants object to various pieces of evidence that plaintiffs present in support of their opposition.  Much of the evidence that defendants object to is immaterial to the court's analysis of the summary judgment motion.  To the extent that the evidence is relevant, the court will address those objections *infra*.

subsequent alleged sexual abuse of female minor plaintiffs J.M.
and A.B. by Marion ("Hank") Coy while in foster care at the Coy
home in Doyle, California.  On May 5, 2003, the three youngest of
plaintiff Amy McConnell's ("McConnell") four minor children, ages
six, four, and nine months, were left alone at home without any
supervision.  (BUF ¶ 1; GUF ¶ 2).  McConnell left the house to go
to the propane company because she believed that there was a
propane leak in her house due to her extremely high gas bill and
the faint smell of gas.  (TUF ¶ 22; Dep. of Amy McConnell
("McConnell Dep.") at 157:3-158:7).  McConnell left the children
with her husband, James E. McConnell, who subsequently left the
house to make a telephone call.  (TUF ¶ 22).  McConnell's father,
Ronald Durand ("Durand"), entered the McConnell's residence and
found the three children by themselves.  (BUF ¶ 2).  Durand
immediately took the children to the offices of Lassen County
CPS.  (BUF ¶ 3).  Durand told T. Chapman that McConnell leaving
the children home alone was an ongoing problem and that he had
warned his daughter that he would take to the children to CPS if
she continued to leave them unattended.  (TUF ¶ 8).[4]  Durand also
told T. Chapman that he was afraid for the children's safety.
(TUF ¶ 8).  T. Chapman attempted to contact James and Amy
McConnell by telephone four to five times, but could not reach
them.  (TUF ¶ 10).  James and Amy McConnell came to the CPS
///

---

[4]     Plaintiffs object to this evidence as inadmissible
hearsay.  However, this evidence is not offered for the truth of
the matter asserted, but rather, to demonstrate knowledge and the
effect on the listener, defendant T. Chapman.  As such, this
evidence is not hearsay.  To the extent that plaintiffs object to
similar statements and evidence, such objections are OVERRULED.

office about one hour after Durand had dropped the children off at CPS.  (TUF ¶ 10).

T. Chapman observed the children at CPS while Durand was present.  (TUF ¶ 11).  He observed that they were dirty and wearing dirty clothes; the nine month old child was fussy and whining.  (TUF ¶ 11).  T. Chapman also observed that after the children were left alone at CPS, they showed no signs of anxiety. (TUF ¶ 13).  T. Chapman believed that the lack of anxiety around strangers indicated a potential problem in the home of the children.  (TUF ¶ 14).  Female plaintiff A.B. informed T. Chapman that both her mother and father had left the children on the morning of May 5, 2003, stating that they would be right back. (TUF ¶ 20).  Both female minor plaintiffs, A.B. and J.M., told T. Chapman that they had been told not to open the door for anyone when left alone and to take the baby into the backroom so that he could not be heard crying.  (TUF ¶ 19).  Female plaintiff A.B. also told T. Chapman that her mother had told her that "what goes on in the house, stays in the house."  (TUF ¶ 16).  Female plaintiff J.M. reported to T. Chapman that her parents always left her alone and that she was very afraid during these occasions.  (TUF ¶ 21).

T. Chapman interview McConnell, who informed him that she believed there was a propane leak in the house and that she had left that morning to go to the propane company.  (Decl. of Terry Chapman in Supp. of Defs.' Mot. for Summ. J. ("T. Chapman Decl."), filed May 8, 2007, ¶ 7).  Subsequently, T. Chapman interviewed James McConnell, who confirmed the existence of a propane leak.  (Id.)  T. Chapman also conducted a history search

4

in the child welfare computer system for any prior history of
interventions by other child protective service agencies
throughout the state.  (TUF ¶ 32).[5]  The search showed that the
McConnell family had prior referrals.  (TUF ¶ 32).  The Kings
County records indicated that James E. McConnell had violated his
probation and been sent to prison for domestic violence.  (TUF ¶
32).

Defendant T. Chapman went to the male minor plaintiff A.B.'s
school and brought him to the CPS office for an interview.  (TUF
¶ 15).  While at the school, the principal showed T. Chapman
minor plaintiffs' A.B. and A.B.'s attendance records, which
indicated numerous unexplained absences; male plaintiff A.B. had
been absent 10 days and tardy 15 days between September 2002 and
April 2003, and female plaintiff A.B. had been absent 25 days and
tardy 7 days in the same general time frame.  (TUF ¶ 15).  The
principal expressed concern to defendant T. Chapman about this
fact.  (TUF ¶ 15).

Officer Stevenson-Hibbs of the Susanville Police Department
interviewed male plaintiff A.B., who was seven years old at the
time.  (TUF ¶¶ 12, 23).  T. Chapman was present during the
interview.  (Decl. of Officer Amber Stevenson-Hibbs ("Stevenson-
Hibbs Decl."), filed May 8, 2007, ¶ 3).  The officer asked A.B.
whether he knew the difference between the truth and a lie, and

---

[5]   Plaintiffs "dispute" this fact, asserting that the
computer search was conducted after the detention of the minor
plaintiffs.  However, plaintiffs fail to cite any evidence
supporting this proposition.  Further, defendant T. Chapman
testified at his deposition that he conducted the computer search
prior to the detention.  (Dep. of Terry Chapman ("T. Chapman
Dep.") at 62:22-63:6).

plaintiff indicated that he did.  (TUF ¶ 24).  A.B. told
Stevenson-Hibbs that his mother left him alone with his brother
and sisters almost every day and that he was required to feed and
bathe them.  (TUF ¶ 25).  He stated that he did not know what to
do when left alone when his nine month old brother became fussy
and began to cry.  (TUF ¶ 25).  A.B. also told Stevenson-Hibbs
that his mother and father fought a lot.  (TUF ¶ 26).  He relayed
that one day when his mother was driving, she got into an
argument with James McConnell.  (TUF ¶ 26). James McConnell
grabbed the steering wheel, and the car in which they were all
riding almost crashed.  (TUF ¶ 26).  A.B. also informed the
officer that James McConnell had dumped a bucket of water over
his head as punishment and that James McConnell had grabbed him
by the neck and threw him against the wall.  (TUF ¶ 27).  A.B.
stated that James McConnell had shown him a drill and told him he
was going to drill him to the wall.  (TUF ¶ 28).  A.B. reported
that he had been spanked by James McConnell and that the spanking
had left bruises.  (TUF ¶ 29).  Finally, A.B. reported that James
McConnell had struck him in the face on May 4, 2003.  (TUF ¶ 30).
Stevenson-Hibbs observed a cut by A.B.'s eye.  (TUF ¶ 30).  A.B.
stated that James McConnell wore a silver ring, which had cut his
face when he was slapped.  (TUF ¶ 30).  A.B. stated that
plaintiff McConnell rarely hit him.  (Stevenson-Hibbs Decl. ¶
6).[6]

---

[6]     Plaintiffs "dispute" facts relating to statements made
by male plaintiff A.B. to Stevenson-Hibbs and T. Chapman,
asserting that A.B. later admitted that many things he said were
an exaggeration.  (TUF ¶¶ 26-31).  However, this later
(continued...)

1    On May 5, 2003, at approximately 1:15 p.m., plaintiffs A.B.,

2   A.B., J.M., and J.M. were detained and placed into protective

3   custody.  (GUF ¶ 1; TUF ¶ 34).  When Durand had first arrived at

4   CPS, T. Chapman asked him whether he and his wife, Sue Durand,

5   the biological grandparents of the minor plaintiffs, would be

6   willing to take the kids.  (TUF ¶ 37).  Durand responded that he

7   didn't believe that they could handle all four children because

8   of his wife's illness.  (TUF ¶ 37).  Subsequently, after Sue

9   Durand arrived at CPS, Ronald and Sue Durand offered to take the

10  kids.  (TDF ¶ 13; Dep. of Ronald Durand ("R. Durand Dep.") at

11  42:20-25).  T. Chapman told Durand that they could not have the

12  children because of the closeness of the relationship between the

13  Durands and the McConnells.  (R. Durand Dep. at 43:5-24).

14  McConnell asserts that she told T. Chapman that James McConnell

15  would leave the household until CPS approved him to return.  (Am.

16  Decl. of Amy McConnell ("McConnell Dep."), filed June 15, 2007).[7]

17

18       [6](...continued)
    explanation does not does not contradict the asserted facts that
19  this was the information conveyed at the time the minor
    plaintiffs were brought into Lassen County CPS.  Moreover,
20  plaintiffs cite generally to male plaintiff A.B.'s deposition
    testimony without providing any specific page or line numbers.
21  Such citation fails to comply with Local Rule 56-260(b).
    Further, the court's independent review of male plaintiff A.B.'s
22  deposition transcript does not reveal that plaintiff admitted to
    exaggerating in the statements made to Stevenson-Hibbs and T.
23  Chapman.

24       [7]  Defendants object to the Declaration of Amy McConnell,
    filed May 22, 2007, on the grounds that it was submitted without
25  the assertion that it was made under penalty of perjury.  On June
    15, 2007, plaintiffs filed an amended declaration that was
26  substantively unchanged, but included the assertion that it was
    made under penalty of perjury.  Defendants object to the court
27  considering this belatedly filed amended declaration.  Because
    plaintiff McConnell's declaration is substantively unmodified
28  from the declaration submitted in support of her opposition,
                                            (continued...)

T. Chapman cannot recall that James McConnell offered to leave
the family residence.  (TUF ¶ 54).  However, based upon the
information he had received regarding prior and current issues of
domestic violence involving Amy McConnell and male plaintiff A.B.
and that Amy McConnell continued to stay with her husband, T.
Chapman believes that this would not have been a reasonable
alternative to detention because there was no certainty that
James McConnell would stay away from the home.  (TUF ¶ 54).[8]  T.
Chapman also felt that the McConnells would leave the children
alone in the home again, where there was the danger of an ongoing
gas leak.  (TUF ¶ 55).  T. Chapman and McConnell discussed the
possibility of placing the children with her brother in Alaska,
but both agreed that the location would prevent visitation and
hinder the reunification process.  (TUF ¶ 38).  T. Chapman also
discussed with McConnell the possibility of placing the children
with her aunt in Yuba City, but both agreed that the location was
too distant to foster the goals of visitation and reunification
and McConnell did not feel her aunt could properly care for her
children.  (TUF ¶ 41).  T. Chapman believed the optimal placement
was a home in Lassen County where the children could remain

///

///

----

[7](...continued)
defendants will not be prejudiced, and their objection is
overruled.

[8]     Plaintiffs "dispute" this fact on the basis that
"[t]his is a common resolution of domestic abuse."  Plaintiffs
cite no evidence in support of this assertion, nor is it clear
how this statement raises a triable issue regarding defendants'
evidence.

together and be close enough to visit with one or both parents.
(TUF ¶ 43).[9]

Lassen County does not license foster homes, but uses the
services of a Foster Family Agency. (TUF ¶ 44). T. Chapman
called two of these agencies, looking for a home that could care
for all four children. (TUF ¶ 44). He chose the Coy home in
Doyle, which had been certified through defendant EA. (TUF ¶
45).

On May 8, 2003, the children were detained by order of a
Lassen County Superior Judge. (GUF ¶ 3). Plaintiff McConnell
and her husband James McConnell were represented by counsel, and
counsel was appointed for the children. (TDF ¶ 32). McConnell
asserts that she was not allowed to obtain separate counsel and
that the obvious conflict between her and her husband was ignored
at that time by the court and counsel. (TUF ¶ 48). On May 19,
2003, at the jurisdictional hearing, McConnell requested separate
counsel and the court appointed McConnell her own attorney. (GUF
¶ 4; TUF ¶ 50). McConnell contends that she was never given an
opportunity to confer with her counsel prior to the hearing, and
therefore, the appointment of counsel was ineffective. (GUF ¶
4). On June 23, 2003, McConnell pled no contest to one count of
child endangerment, a violation of Welfare and Institutions Code
§ 300(b). (GUF ¶ 5). McConnell asserts that she was coerced
into the plea. (GUF ¶ 5). On August 12, 2003, James McConnell

---

[9]     Plaintiffs "dispute" this fact, asserting that T.
Chapman completely failed to consider relative placement.
However, plaintiffs' admission that, at the very least, McConnell
and T. Chapman considered placement with McConnell's brother
belies this general and unsupported assertion.

pled no contest to violations of Welfare and Institutions Code §§ 300 (a) and 300(b).  (TUF ¶ 52).  Jurisdiction was terminated on December 6, 2004.  (TUF ¶ 53).

On August 12, 2003, T. Chapman prepared a case plan.  (TUF ¶ 57).  McConnell and her husband signed the plan, acknowledging that they had participated in the plan's development and that they agreed to participate in the services outlined in the plan. (TUF ¶ 57).  McConnell contends that she was coerced into signing the case plan because CPS threatened that if she did not sign the case plan, she would never get her children back in her custody. (TUF ¶ 57).

Plaintiffs A.B., A.B., J.M., and J.M. were placed at the home of defendant Barbara Coy and Hank Coy[10] on or about May 5, 2003 until September 29, 2003.  (GUF ¶ 6).  Defendant EA certified the family home operated by the Coys from June 1, 1995 until November 11, 2003.  (EUF ¶ 5).  EA is a non-profit corporation and foster family agency that recruits and certifies foster family homes in Lassen County, conducts background checks of prospective foster parents and verifies that homes are safe and acceptable for the placement of foster children.  (EUF ¶¶ 1, 3-4, 13).  EA conducts training of its prospective foster parents regarding how they should properly discharge their duties as foster parents and provides professional support to foster parents.  (EUF ¶¶ 5, 12).  EA also conducts visits to foster

---

[10]   On May 14, 2007, the court filed a memorandum and order, granting defendant Barbara Coy's motion for summary judgment as to plaintiffs' sole claim against her for negligence. (Mem. & Order, Docket # 146, filed May 14, 2007).  Hank Coy was not named as a defendant in this action.

homes to ensure that the needs of the foster parents and the foster children are met and to ensure that continued placement in a particular home is in the best interests of the foster parents and the foster children. (EUF ¶ 15). However, foster family agencies such as EA do not provide daily care for foster children. (EUF ¶ 11). The daily care and supervision of foster children, such as the minor plaintiffs, is provided by foster parents. (EUF ¶ 12).

The Coys had approximately 17 foster children in their home during their tenure as foster parents. (EUF ¶ 63).[11] EA's certification of the Coys as foster parents included a criminal background check of both Barbara and Hank Coy; prior to Hank Coy's conviction for his conduct involving female plaintiff J.M., neither of the Coys had ever been convicted of a felony. (EUF ¶¶ 64-65). In the year prior to her husband's arrest, Barbara Coy did not observe any conduct or behavior by her husband that caused her to think that Hank Coy could endanger the safety of the children. (EUF ¶ 66). Nor did she have any reason to believe that her husband would engage in inappropriate sexual acts toward a child. (EUF ¶ 67). None of the three oldest minor plaintiffs ever told Barbara Coy that they did not want to be left alone with Hank Coy or that he touched them in a way they

///

---

[11] Plaintiffs "dispute" defendant's facts that are based upon defendant Coy's deposition testimony and declaration on the grounds that such statements lack credibility. However, plaintiffs cannot sufficiently raise a triable issue of fact simply by raising issues regarding the credibility of defendant's evidence. See Nat'l Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983).

did not like.  (EUF ¶ 72).[12]   Until the time that her husband admitted to sexually molesting female plaintiff J.M. on or about September 28, 2003, Barbara Coy never told anyone at EA or CPS that she thought Hank Coy might be engaging in inappropriate sexual activity toward any child.  (EUF ¶ 68).  Nor did Barbara Coy inform EA that she thought her husband was developing early symptoms of Alzheimer's disease.  (EUF ¶ 73).  Plaintiffs are not aware of any evidence that EA had knowledge of the propensity of Hank Coy to engage in acts of sexual molestation or abuse prior to the time that the minor plaintiffs were placed in the Coy home. (EUF ¶ 78).

The EA social worker assigned to the Coy foster family during the time that the minor plaintiffs resided there was Judie Oliviera ("Oliviera").  (EUF ¶ 23).  Oliviera received a bachelor's degree in child development and social work from Humboldt University in June 1989.  (EUF ¶ 29).  From 1989 to 2001, Oliviera worked as a social worker for Lassen County CPS. (EUF ¶ 31).  She commenced her employment with EA in 2001.  (EUF ¶ 32).  On May 7, 2003, Oliviera prepared Needs and Services Plans for each of the four children.  (EUF ¶ 26).  Oliviera documented ten visits and at least six telephone calls to the Coy foster family home during the period of May 5, 2003 to September 29, 2003, as part of her duties.  (EUF ¶ 24).

///

---

[12]   Plaintiffs "dispute" defendant's facts that are based upon defendant Coy's deposition testimony and declaration on the grounds that such statements lack credibility.  However, plaintiffs cannot sufficiently raise a triable issue of fact simply by raising issues regarding the credibility of defendant's evidence.  See Nat'l Union Fire. Ins. Co., 701 F.2d at 97.

1    While Oliviera worked at EA, she looked for behaviors of a

2    child to determine whether that child was molested, such as

3    whether the child was overprotective or withdrawn. (EUF ¶ 37).

4    Oliviera observed the McConnell children "act out" prior to being

5    informed that the female plaintiff J.M. had been molested, but

6    she did not believe the behavior was evidence of molestation

7    occurring in the Coy home. (EUF ¶ 38). Specifically, Barbara

8    Coy told Oliviera that J.M. had kicked Hank Coy. (EUF ¶ 41).

9    Oliviera told Coy that this behavior sounded like symptoms of

10   child molestation and that she thought the children had probably

11   been molested before they were placed in foster care. (Dep. of

12   Barbara Coy ("Coy Dep.") at 99:8-100:11). In response, Oliviera

13   went to the Coy home, observed the children, and talked to the

14   children. (EUF ¶ 42). Oliviera believed that J.M. struck Hank

15   Coy because she had been suspended from school because of her

16   behavior and was taking her frustration out on the foster parent.

17   (EUF ¶ 46). Oliviera did not observe anything which caused her

18   to believe that any of the minor plaintiffs were being molested

19   at the Coy home. (EUF ¶ 47). Oliviera spoke to T. Chapman about

20   J.M.'s behavior. They discussed that when children start

21   visiting with their biological parents and then return to their

22   foster parent, children may begin to act out, no matter how good

23   the foster parent is. (EUF ¶ 45).

24   On or about September 29, 2003, Hank Coy confessed that he

25   molested female plaintiff J.M. (See EUF ¶ 27). Hank Coy was

26   arrested for the sexual abuse of J.M. and is currently

27   incarcerated on these charges. (See Mem. & Order, Docket # 146,

28   filed May 14, 2007, at 4). Female plaintiff A.B. also asserts

that Hank Coy molested her.  (Dep. of female plaintiff A.B.
("F.A.B. Dep.") at 52:3-5).

On September 29, 2003, defendant Griffith became the CPS
social worker for McConnell and the minor plaintiffs.  (GUF ¶ 9).
Prior to this, Griffith had no involvement in plaintiffs' CPS
case.  (GUF ¶ 11).  Upon assignment of the case, Griffith
reviewed the CPS file, which included the Case Plan signed by
McConnell.  (GUF ¶¶ 12-13).  On September 29, 2003, Griffith
placed the children in the home of their maternal grandparents,
the Durands.  (GUF ¶ 14).  She remained the social worker
assigned to the McConnell family until she was transferred to
another department on February 15, 2004.  (GUF ¶ 15).  While the
minor plaintiffs were at the Durand home, Griffith documented
that she saw the children in person on sixteen separate
occasions, and she spoke to the children and the Durands
regularly.  (GUF ¶¶ 16-17).  Griffith filed one court report
while she was plaintiffs' social worker, a Six-Months Status
Review Report filed on January 5, 2004.  (GUF ¶ 18).

Griffith also had regular contact with McConnell.  (GUF ¶
19).  She was kept apprised of McConnell's progress in completing
her Case Plan through correspondence with and telephone calls
from staff from Lassen County Alcohol and Drug and Lassen County
Mental Health.  (GUF ¶ 20).  The completion of the
responsibilities outlined in the Case Plan determined whether
McConnell would be eligible to regain custody of her children.
(GUF ¶ 21).  Griffith asserts that on several occasions,
McConnell failed to attend her children's mental health
appointments or school events after promising them that she would

1 | attend.  (GUF ¶ 24).  Griffith asserts that McConnell also missed
2 | some of her scheduled phone and in-person visits with her
3 | children.  (GUF ¶ 25).  Further, Griffith contends that McConnell
4 | frequently chose not to attend her Drug and Alcohol classes and
5 | mental health appointments while Griffith was her social worker.
6 | (GUF ¶ 26).  McConnell maintains that she only missed
7 | appointments if she was at work and couldn't leave or if CPS
8 | didn't give her notice of a last minute visit.  (McConnell
9 | Decl.).

10 | On November 10, 2005, plaintiffs filed their Second Amended
11 | Complaint, the operative pleading in this matter.  Plaintiffs
12 | bring claims under 42 U.S.C. § 1983 for violations for their
13 | Fourth and Fourteenth Amendment rights as well as state law
14 | claims for intentional infliction of emotional distress,
15 | negligence, and breach of contract.

16 | **STANDARD**

17 | Summary judgment is appropriate when it is demonstrated that
18 | there exists no genuine issue as to any material fact, and that
19 | the moving party is entitled to judgment as a matter of law.
20 | Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144,
21 | 157 (1970).

22 | Under summary judgment practice, the moving party

23 | always bears the initial responsibility of informing
24 | the district court of the basis of its motion, and
     | identifying those portions of "the pleadings,
25 | depositions, answers to interrogatories, and admissions
     | on file together with the affidavits, if any," which it
26 | believes demonstrate the absence of a genuine issue of
     | material fact.

27 | Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the
28 | nonmoving party will bear the burden of proof at trial on a

15

dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"   Id. at 324.   Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   Id. at 322.   In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."   Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).   In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.   Fed. R. Civ. P. 56(e).   The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, id. at 251-52.

1    In the endeavor to establish the existence of a factual
2  dispute, the opposing party need not establish a material issue
3  of fact conclusively in its favor.  It is sufficient that "the
4  claimed factual dispute be shown to require a jury or judge to
5  resolve the parties' differing versions of the truth at trial."
6  First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary
7  judgment is to 'pierce the pleadings and to assess the proof in
8  order to see whether there is a genuine need for trial.'"
9  Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory
10  committee's note on 1963 amendments).

11    In resolving the summary judgment motion, the court examines
12  the pleadings, depositions, answers to interrogatories, and
13  admissions on file, together with the affidavits, if any.  Rule
14  56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir.
15  1982).  The evidence of the opposing party is to be believed, and
16  all reasonable inferences that may be drawn from the facts placed
17  before the court must be drawn in favor of the opposing party.
18  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not
19  drawn out of the air, and it is the opposing party's obligation
20  to produce a factual predicate from which the inference may be
21  drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,
22  1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

23    Finally, to demonstrate a genuine issue, the opposing party
24  "must do more than simply show that there is some metaphysical
25  doubt as to the material facts. . . . Where the record taken as a
26  whole could not lead a rational trier of fact to find for the
27  nonmoving party, there is no 'genuine issue for trial.'"
28  Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

**I.  Defendant Board of Supervisors**

Plaintiffs bring claims under 42 U.S.C. § 1983 against the individual members of the Lassen County Board of Supervisors, defendants Hanson, Dahle, Keefer, Pyle, and J. Chapman (collectively, the "Board defendants"), in their personal capacities[13] for alleged violations of plaintiffs' Fourth and Fourteenth Amendment rights.[14]  Plaintiffs assert that the Board defendants had an official policy of deliberate indifference to the constitutional rights of person whose children were taken into custody by Child Protective Services. (Pls.' Am. Opp'n to Def. Board's Mot. for Summ. J., filed May 22, 2007, at 3). Specifically, plaintiffs content that the Board defendants "involved themselves in the affirmative rejection of the recommendations of the Grand Jury and their refusal to set in place those actions that would result in the compliance of the CPS directly caused" plaintiffs' injuries. (<u>Id.</u> at 4).  The Board defendants assert that they are entitled to absolute legislative immunity for their actions.

It is well settled that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for

---

[13]    It is undisputed that each member of the Board of Supervisors is being sued in his personal capacity.  (BUF ¶ 30).

[14]    Plaintiffs clarified in their opposition that "[t]he basis of the claims against the Board of Supervisors are constitutional deprivations under 42 U.S.C. § 1983." (Pls.' Am. Opp'n to Def. Board's Mot. for Summ. J., filed May 22, 2007, at 10).  In light of this clarification and plaintiffs' failure to address the merits of any state claims against these defendants, to the extent that plaintiffs' complaint alleged any state tort claims, the Board defendants' motion for summary judgment regarding such claims is GRANTED.

their legislative activities." <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 49 (1998) (finding that the defendants were absolutely immune from suit where the alleged unlawful conduct included voting for an ordinance, introducing a budget, and signing an ordinance into law).  However, "[a]bsolute immunity applies only when legislators act in their legislative capacities, not in their administrative or executive capacities." <u>Chateaubriand v. Gaspard</u>, 97 F.3d 1218, 1220 (9th Cir. 1996). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." <u>Kaahumanu v. County of Maui</u>, 315 F.3d 1215, 1219 (9th Cir. 2003).

The Ninth Circuit has set out a four factor analysis for determining whether an act is legislative for the purposes of establishing absolute immunity.  <u>See</u> <u>id.</u> at 1220.  The court must consider:

> "(1) whether the act involves ad hoc decisionmaking, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation."

<u>Id.</u> at 1220 (internal citations and quotations omitted).  "The Supreme Court has generally been quite sparing in its recognition of claims to absolute official immunity." <u>Id.</u> at 1219-20 (internal quotations omitted).

The gravamen of plaintiffs' complaint against the Board defendants is that their deliberate failure to act to remedy deficiencies in Lassen County CPS, such as inadequately trained social workers, amounted to an official policy of operating a non-compliant CPS and of deliberate indifference to constitutional rights.  (<u>See</u> Amy McConnell's Answers to Def.

Board's Interrogatories, Exs. C-G to Decl. of Kathleen J. Williams in Supp. of Def. Board's Mot. for Summ. J., filed May 8, 2007).[15]  As such, the conduct complained of by plaintiffs, by their own allegations and argument, involve the formulation of policy.  See Bogan, 523 U.S. at 55-56 (holding that legislative immunity applied because the local officials' actions "reflected a discretionary, policymaking decision implicating the city's budgetary interest"); cf. Kaahumanu, 315 F.3d at 1220 (finding that the Council's decision was ad hoc because it was based upon the circumstances of the particular case); Trevino v. Gates, 23 F.3d 1480, 1482 (9th Cir. 1994) (finding that the Board's decision to indemnify specific punitive damages awards against certain police officers did not involve the formulation of policy).  Moreover, by plaintiffs' own assertions, the alleged policy of inaction did not target a few specific individuals, but rather, affected CPS, its employees, the children taken into custody and parents of those children.  See id.  Therefore, the policy at issue affected the public at large.

The remaining factors, whether the act was formally legislative in character and whether it bears all the hallmarks

_____

[15]    The answers to numerous interrogatories provide:

As a Supervisor, [defendant] was required to *vote* and make provision for the acts and omissions of CPS.  He is one of the persons who *sets policy* and adopts the acts and failures to act of the employees of Lassen County *as policy* by taking no action.  He had knowledge of the prior litigation involving CPS.  He also had prior knowledge of Grand Jury reports.  *His adoption of policy* because of actions or failure to act have a direct relationship to the damages done to Amy McConnell and her minor children.

Id. (emphasis added).

1  of traditional legislation, are difficult to apply in this case

2  because plaintiffs' complaint arises out of the alleged

3  deliberate refusal of Board defendants to adopt policy.  Thus,

4  the conduct complained of is a failure to act.  However, if Board

5  defendants acted on the Grand Jury's recommendation and attempted

6  to reform CPS by establishing new training, supervision, or

7  discipline requirements, such conduct would involve votes.  Such

8  involvement is presumed since, as members of a legislative body,

9  Board defendants can only act through their votes.  Hart v. Baca,

10 204 F.R.D. 456, 459 (C.D. Cal. 2001).  Therefore, because any

11 affirmative conduct regarding policy changes to Lassen County CPS

12 would be formally legislative in nature, the deliberate choice

13 not to adopt such policies is considered likewise.  See id.

14 (holding that defendant supervisors were entitled to absolute

15 legislative immunity for the actions they took or failed to take

16 regarding the failure to adequately train, supervise, and

17 discipline sheriff's deputies).  Further, defendants' alleged

18 deliberate refusal to reform Lassen County CPS is a

19 discretionary, policymaking decision that has prospective

20 implications and implicates budgetary concerns.  As such, the

21 alleged act (or failure to act) bears all the hallmarks of

22 traditional legislation.  See Bogan, 523 U.S. at 55-56; cf.

23 Kaahumanu, 315 F.3d at 1223.

24      Because defendants' alleged conduct in deliberately refusing

25 to set in place actions that would result in the creation of a

26 compliant Lassen County CPS was a policy decision that affected

27 the public at large and because such conduct was formally

28 legislative in nature and bears the hallmarks of traditional

21

legislation, Board defendants are entitled to absolute legislative immunity for their alleged conduct.[16]   Therefore, Board defendants' motion for summary judgment regarding plaintiffs' claims under 42 U.S.C. § 1983 is GRANTED.

**II.  Defendant Loel Griffith**

Plaintiff Amy McConnell brings a claim against defendant Loel Griffith under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment rights, and all plaintiffs bring claims under California state law for negligence in failing to fulfil a mandatory duty and intentional infliction of emotional distress.[17]   Defendant Griffith contends that summary judgment should be granted because none of the plaintiffs' allegations of wrongdoing or injury can be attributed to defendant's actions.

**A.    42 U.S.C. § 1983**

In order to establish her claim under § 1983, plaintiff McConnell must demonstrate that defendant Griffith (1) acted under color of state law, and (2) deprived plaintiffs of a right secured under the Constitution or federal statutes.  <u>Gibson v. United States</u>, 781 F.2d 1334, 1338 (9th Cir. 1986).

Plaintiff McConnell asserts that defendant Griffith violated her Fourteenth Amendment rights to familial association through

---

[16]   Plaintiffs fail to present any evidence that Board defendants' administrative acts caused their alleged harm.  On a motion for summary judgment, plaintiffs' conclusory assertion that acts are administrative, not legislative, is insufficient to raise a triable issue of fact.

[17]   Defendant asserts that defendant Griffith was dismissed from plaintiff's intentional infliction of emotional distress claim pursuant to a motion to dismiss the First Amended Complaint.  Plaintiff does not contest this assertion.  However, for the sake of completeness, the court will address both of plaintiffs' state law claims against defendant Griffith.

the continued, unjustified detention of the children after
Griffith was appointed as the social worker for the McConnell
family.   It is well-settled that the Fourteenth Amendment
protects the right of parents and children to live together
without governmental interference.   Wallis v. Spencer, 202 F.3d
1126, 1136 (9th Cir. 2000) (collecting cases).   As such, parents
and children cannot "be separated by the state without due
process of law except in an emergency."   Id. at 1136-37.

Specifically, plaintiff asserts that Griffith violated her
constitutional rights by creating a case plan, failing to get the
signature and approval of McConnell, and then holding any
sessions that McConnell allegedly missed against McConnell.   (Am.
Opp'n to Mot. for Summ. J. of Griffith, Docket # 170, filed May
23, 2007, at 2).   The case plan identified by plaintiff as
problematic is a case plan dated March 15, 2004.   (Id. at 2).   It
is undisputed that Griffith was the social worker assigned to the
McConnell family until February 15, 2004.   (GUF ¶ 15).   As such,
defendant ceased to be the assigned social worker on the case one
month before the case plan was signed.   Moreover, on the copy of
the case plan submitted by plaintiff,[18] the social worker whose
name and signature appear on the document is Tamara Chandler, not
Loel Griffith.   (Ex. 3 to Decl. of Treva J. Hearne in Opp'n to
Griffith's Mot. ("G. Hearne Decl."), filed May 23, 2007).
Therefore, plaintiffs have failed to proffer any evidence that
///

---

[18]   Defendant Griffith objects to the submitted case plan
as not properly authenticated.   The court does not address
defendant's objection because even if the court considers such
evidence, plaintiff has failed to raise a triable issue of fact.

23

defendant Griffith was responsible for any alleged conduct
relating to the case plan prepared on March 15, 2004.

Plaintiff also asserts that the children were separated and
placed in two different foster homes.  Plaintiff offers no
evidence in support of this assertion and fails to identify when
such separation occurred or how defendant Griffith was involved
in the separation.  Plaintiff merely cites to the Case Plan
prepared on or about March 15, 2004, which was signed by another
social worker.[19]  Rather, the status report submitted to the
court by Loel Griffith, dated January 5, 2004, indicates that, at
that time, the minor plaintiffs were all placed with their
maternal grandparents, the Durands. (Status Report, Ex. B to
Decl. of Loel Griffith ("Griffith Decl."), filed May 8, 2007).

Although plaintiff primarily references allegations relating
to the case plan and the separation of the children in her
opposition, the gravamen of plaintiff McConnell's claim against
defendant Griffith is that Griffith violated her rights to
familial association through the continued, unjustified detention
of the children.  However, at the time that Griffith became the
social worker for the McConnell family, the children were under
the jurisdiction of the Lassen County Juvenile Court, which on
May 8, 2003, in response to the Juvenile Dependency Petition, had

---

[19]    Plaintiff cites to Exhibit 1, which Treva J. Hearne
declared are the investigation reports and service logs found in
the court files of the Lassen County Superior Court.  Citation to
this exhibit makes little sense in the context of plaintiff's
argument.  However, in the preceding paragraph of her opposition,
(Opp'n at 2), plaintiff mis-cited to the case plan as Exhibit 1,
although the case plan was filed as Exhibit 3 to the Declaration
of Treva J. Hearne.  As such, the court assumes plaintiff was
attempting to cite to the case plan.

ordered detention of the children at a suitable place or home and
in the custody of Lassen County CPS.  (See Lassen County Order of
Detention, Ex. A to Def. Griffith's Request for Judicial Notice,
filed May 8, 2007); Cal. Welf. & Inst. Code § 300 (West 2007).
Section 303 of the California Welfare and Institutions Code
provides that "[t]he court may retain jurisdiction over any
person who is found to be a dependent child of the juvenile court
until the ward or dependent child attains the age of 21 years."
Cal. Welf. & Inst. Code § 303.  However, "[a] *judge* of the
juvenile court in which a petition was filed . . . may dismiss
the petition if the *court* finds that the interests of justice and
the welfare of the minor require the dismissal . . . ."  Cal.
Welf. & Inst. Code § 390.  As such, as a social worker, defendant
Griffith did not have the unilateral authority to return the
children to plaintiff McConnell.  Further, "social workers enjoy
absolute, quasi-judicial immunity when making post-adjudication
custody decisions pursuant to valid court order."  <u>Mabe v. San
Bernardino County</u>, 237 F.3d 1101, 1109 (9th Cir. 2001).

However, to the extent that plaintiff McConnell contends
that the one document Griffith submitted to the court during her
tenure as the family's social worker violated her Fourteenth
Amendment rights, such argument also fails.  In the status
report, dated January 5, 2004, Griffith recommends that the
reunification services to plaintiff Amy McConnell and James
McConnell be terminated.  (Status Report at 1).  This
recommendation was made on the basis that McConnell had current
criminal charges pending, she was being evicted from the family
house, and that many of the items in the case plan remained

25

1   unfinished and in progress. (Status Report at 14). The report

2   also noted that McConnell had three positive drug screens with

3   Lassen County Children and Family Services: (1) on September 18,

4   2003, she tested positive for opiates, methamphetamine, and THC;

5   (2) on November 11, 2003, she tested positive for

6   methamphetamine; and (3) on November 21, 2003, she tested

7   positive for opiates and did not show proof of a prescription for

8   Vicodin. (Status Report at 11).

9        Plaintiff argues that none of the drug tests performed on

10  McConnell by CPS or Lassen County was done properly.[20] She

11  argues that defendant violated her constitutional rights by not

12  providing this exculpatory evidence. However, the testimony

13  cited to by plaintiffs does not support the broad assertion that

14  no drug test was done properly. The service logs, prepared by

15  Lassen County, provide that on September 18, the swab test was

16  invalid due to the lack of saliva, but showed positive for

17  methamphetamine. (Ex. 1 to G. Hearne Decl. at 8). On September

18  19, 2003, although the urine dip test was negated, an oral swab

19  showed that McConnell tested positive for opiates, amphetamines,

20  and THC. (Id. at 9). The last date covered by the status

21  reports referenced by plaintiff is September 15, 2003. (Id. at

22  10). As such, there is no evidence disputing the administration

23  of the November 2003 drug tests. Plaintiff's assertion that the

24  drug tests were improperly performed is without evidentiary

25

26        [20]   Defendant Griffith objects to the submitted records as
27  not properly authenticated and containing inadmissible hearsay.
    The court does not address defendant's objection because even if
28  the court considers such evidence, plaintiff has failed to raise
    a triable issue of fact.

support.  Therefore, her claims regarding defendant's failure to

disclose this information are without merit.[21]

Moreover, the court notes that plaintiff Amy McConnell

testified at her deposition that *she had no complaints about*

*defendant Loel Griffith*.  (GUF ¶ 34).  The court finds it

troubling that plaintiff continues to press claims against a

defendant that she testified, under penalty of perjury, she has

no complaints against.  However, for the reasons set forth above,

defendant Griffith's motion for summary judgment regarding

plaintiff McConnell's claims for violation of her Fourteenth

Amendment rights is GRANTED.

In her opposition, plaintiff asserts for the first time that

defendant Griffith delayed in getting J.M. medical care after she

was molested by Hank Coy.  Plaintiff contends that this delay

prevented diagnosis of the extent of the sexual molestation.

Even under liberal notice pleading standards, plaintiffs did not

allege a claim against Griffith in their complaint based upon the

failure to promptly provide medical service.  Rather, the crux of

---

[21]   Further, even if such claims could be substantiated, defendant Griffith would be entitled to absolute immunity from the claim that she submitted false of incomplete documents to the juvenile court.  See e.g. Beltran v. Santa Clara County, – F.3d –,No. 05-16976, 2007 WL 1805559 (9th Cir. Jun. 25, 2007) (holding that social workers are entitled to absolute immunity for verified statements in petitions filed with a dependency court, including dependency and custody petitions); Doe v. Lebbos, 348 F.3d 820, 826 (9th Cir. 2003) (failure to investigate possible exculpatory evidence and fabricated evidence); Mabe, 237 F.3d at 1109 (social worker alleged to have improperly conducted the investigation and falsified evidence in juvenile court proceedings); Hennessey v. State of Wash., Dep't of Soc. & Health Serv., 627 F. Supp. 137, 140 (E.D. Wash. 1985) (caseworker allegedly divulged false and misleading information to county prosecutor, prompting initiation of child dependency proceedings).

plaintiff McConnell's claim is that defendant failed to return the children to her after defendant became the McConnell's social worker.

Even if the court construes plaintiff's assertion of a new theory as a motion to amend their complaint,[22] plaintiff has not shown "good cause" to amend the pleading under Federal Rule of Civil Procedure 16(b), as is required by the court's Pretrial Scheduling Order. (Pretrial Scheduling Order, Docket # 59, filed Apr. 18, 2006). The good cause requirement of Rule 16 primarily considers the diligence of the party seeking the amendment. See Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir. 1992). When the proposed modification is an amendment to the pleadings, the moving party may establish good cause by showing "(1) that [he or she] was diligent in assisting the court in creating a workable Rule 16 order; (2) that [his or her] noncompliance with a rule 16 deadline occurred or will occur, notwithstanding [his or her] diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that [he or she] was diligent in seeking amendment of the Rule 16 order, once it became apparent that [he or she] could not comply with the order." Jackson v. Laureate, Inc., 186 F.R.D. 605, 608 (E.D. Cal. 1999) (citations omitted). Whether or not defendant Griffith promptly obtained

---

[22] See Apache Survival Coalition v. United States, 21 F.3d 895, 910 (9th Cir. 1994) (holding that when issues are raised in opposition to a motion for summary judgment which are outside the scope of the complaint, the court should construe the opposition as a motion to amend the pleadings).

medical care for J.M. after the sexual abuse is a fact that has
not changed since the filing of the complaint.  To the extent
that facts were obtained in discovery which led to the assertion
of this theory, plaintiff does not identify when such facts were
obtained, nor does she contend that amendment of the complaint
was requested promptly after the plaintiff obtained such
knowledge.  Therefore, plaintiff has failed to demonstrate "good
cause" to add a claim based upon defendant Griffith's alleged
failure to provide prompt medical care.

Furthermore, even if such "good cause" could be
demonstrated, in order to successfully amend the complaint,
plaintiff would also have to show that leave to amend is
warranted under Federal Rule of Civil Procedure 15(a) which
states "leave [to amend] is to be freely given when justice so
requires."  Plaintiff has failed to proffer any argument that the
interests of justice require granting plaintiffs leave to amend
their complaint at this late stage in the proceedings when all
discovery has closed and the deadline for filing dispositive
motions has passed.  Moreover, plaintiff McConnell has failed to
allege how defendant's alleged failure to promptly provide
medical care to J.M. violated her Fourteenth Amendment right to
familial association.  As such, the court does not consider the
merits of this claim.

**B.   California State Law Claims**

Plaintiffs allege that defendant Griffith was negligent in
her performance of mandatory duties and that she intentionally
inflicted emotional distress upon them.  Defendant Griffith

1  contends that plaintiffs' claims must be dismissed for failure to

2  comply with the California Tort Claims Act.[23]

3      In order to state a tort claim against a public entity, the

4  California Torts Claim Act requires "the timely presentation of a

5  written claim and the rejection of the claim in whole or in

6  part." Mabe v. San Bernardino County, 237 F.3d 1101, 1111 (9th

7  Cir. 2001) (quoting Mangold v. Cal. Pub. Util. Comm'n, 67 F.3d

8  1470 (9th Cir. 1995)).  Tort claims such as the instant claims

9  for intentional infliction of emotional distress and negligence

10  are not listed among the exceptions to § 905.  Moreover, under

11  California Government Code § 945.4,

12      no suit for money or damages may be brought against a
    public entity on a cause of action for which a claim is
13      required to by presented in accordance with Chapter 1
    (commencing with section 900) and Chapter 2 (commencing
14      with section 910) of Part 3 of this division until a
    written claim therefore has been presented to the
15      public entity and has been acted upon by the board, or
    has been deemed to have been rejected by the board.

16

17  Cal. Gov't Code § 945.4 (West 2007).  Finally, under California

18  Government Code § 950.2, any suit against a public employee is

19  barred in cases where a plaintiff's action against the agency is

20  barred for failure to present a claim.  Cal. Gov't Code § 950.2

21  (West 2007).  The 1965 Amendment to § 950.2 makes it clear that

22  "the presentation of a claim to the employing public entity is a

23  prerequisite to suit against an employee." Id.  Claims relating

24  to personal injury must be filed no later than six months after

25

26      [23]  Plaintiffs utterly fail to respond to defendant
    Griffith's contention that they failed to timely comply with the
27  California Tort Claims Act.  Such silence could be interpreted as
    a non-opposition to defendant's argument.  However, for the sake
28  of completeness, the court will address the issue herein.

1  the accrual of the cause of action.  Cal. Gov't Code § 911.2

2  (West 2007).

3      Plaintiffs' claims were filed on December 16, 2004 and

4  January 21, 2005, at least ten months after defendant Griffith

5  ceased to be plaintiffs' social worker on February 15, 2004.

6  Further, defendant Griffith was not named in any of the claims

7  filed by plaintiffs.  As such, plaintiffs have failed to comply

8  with the California Tort Claims Act.

9      However, even if plaintiffs had complied with the procedural

10  prerequisites to bringing their tort claims, they have failed to

11  produce any evidence that defendant Griffith acted negligently or

12  intentionally inflicted emotional distress.  In their complaint,

13  plaintiffs assert that defendant Griffith failed to prepare a

14  case plan within sixty days of the minor children being taken

15  into custody.  (Compl. ¶¶ 97, 104).  Defendant Griffith was not

16  the social worker for the McConnell family until September 29,

17  2003, five months after the children were detained.  Therefore,

18  she had no duty to prepare the initial case plan for the

19  McConnell family.[24]  Plaintiffs also allege that defendant had a

20  mandatory duty to give preference to a family member who could

21  take care of the children.  (Compl. ¶ 98).  However, the evidence

22  produced by the parties indicate that the minor children were

23  placed with their maternal grandparents during defendant's tenure

24  as their social worker.

25

26      [24]   Plaintiffs also allege that defendant did not provide
27  adequate reunification services.  (Compl. ¶ 104).  However,
   plaintiffs do not argue the merits of this allegation in their
28  opposition or provide any evidence to support this claim.  As
   such the court deems this claim waived by plaintiffs.

Plaintiffs further allege that defendant Griffith failed to comply with the provisions of § 309 of the California Welfare and Institutions Code, requiring release of a detained child unless there is an immediate and urgent need to continue the detention and there are no reasonable means by which the child can be protected at home.[25]  (Compl. ¶ 104); Cal. Welf. & Inst. Code § 309.  However, § 309 imposes this duty upon the social worker of a child who has been taken into *temporary custody*, i.e. detention of a child without a warrant.  <u>See</u> Cal. Welf. & Inst. Code §§ 305, 309.  At the time that defendant Griffith was the McConnell family's social worker, the Lassen County Juvenile Court had ordered the detention of the minor plaintiffs.  As such, § 309 does not apply to defendant Griffith.[26]

Finally, for the reasons set forth above in the court's discussion of plaintiff McConnell's Fourteenth Amendment claim and plaintiffs' negligence claim, plaintiffs have failed to set forth any evidence of conduct by defendant Griffith that intentionally inflicted emotional distress upon plaintiffs.  The

[25]   Plaintiffs cite <u>Parkes v. County of San Diego</u> in support of their argument that defendant Griffith violated § 309. 345 F. Supp. 2d 1071, 1084 (S.D. Cal. 2004).  However, in <u>Parkes</u>, the court discussed § 309 in it analysis of the plaintiffs' claims relating to the pre-hearing detention.  In this case, plaintiffs' claims against defendant Griffith relate to the post-hearing detention.  Further, the court in <u>Parkes</u> found that defendant social worker was entitled to immunity.

[26]   Plaintiffs also allege that defendant Griffith failed to perform a mandatory duty under § 387 of the Cal. Welf. & Inst. Code, which relates to supplemental petitions to modify a previous order removing a child from the physical custody of a parent.  (Compl. ¶ 104).  As an initial matter, it is unclear what duty this section allegedly imposed upon defendant Griffith. Moreover, plaintiffs do not argue the merits of this allegation in their opposition or provide any evidence to support this claim.

1  court again notes that plaintiff testified that she has no

2  complaints against defendant Griffith.  (GUF ¶ 34).

3       Therefore, defendant Griffith's motion for summary judgment

4  regarding plaintiffs' state law claims is GRANTED.

5  **III. Defendant Terry Chapman**

6       Plaintiffs bring claims against defendant Terry Chapman

7  under 42 U.S.C. § 1983 for violations of their Fourth and

8  Fourteenth Amendment rights and under California state law for

9  negligence in failing to fulfil a mandatory duty and intentional

10 infliction of emotional distress.[27]

11      **A.   42 U.S.C. § 1983**

12      Defendant T. Chapman contends that summary judgment should

13 be granted regarding plaintiffs' § 1983 claims because there have

14 been no constitutional violations.  Plaintiffs' claims arise out

15 of the removal and detention of the minor children.[28]

16 ///

17 ///

18

19      [27]   In her complaint, plaintiff McConnell makes numerous,
20 vague references to other conduct by defendants T. Chapman,
   Lassen County, Loel Griffith, and Margaret Crosby that allegedly
21 deprived her of procedural and substantive due process.  (See
   e.g., Compl. ¶¶ 72-75).  The court does not address these
22 allegations herein as plaintiff does not raise these theories in
   her opposition to the motions, and therefore, the court deems
23 these claims waived.

24      Moreover, the gravamen of plaintiff's claims are that she
   was deprived of here fundamental right to familial relations due
25 to the detention of her children.  The court discusses these
   claims infra.

26      [28]   While plaintiff McConnell's claim is brought pursuant
27 to the Fourteenth Amendment and the minor plaintiffs' claims are
   brought pursuant to the Fourth Amendment, the standard under
28 which these claims must be assessed are the same, and thus the
   court addresses them together.  See Lebbos, 348 F.3d at 827 n.9.

### 1.   Pre-hearing Detention

Plaintiffs allege that defendant T. Chapman violated their constitutional rights under the Fourth and Fourteenth Amendments because defendant T. Chapman detained the minor plaintiffs without a warrant.  It is well-established that parents and children cannot "be separated by the state without due process of law except in an emergency."  <u>Wallis</u>, 202 F.3d at 1136–37. "Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."  <u>Id.</u> at 1138. Defendant T. Chapman asserts that the minor plaintiffs were removed without a warrant because of exigent circumstances. Defendant also asserts that he is entitled to qualified immunity for his conduct.

### a.   Violation of a Constitutional Right

Defendant's initial contact with the children was made when Durand brought the children into Lassen County CPS on May 5, 2003.  Durand informed defendant that three of the children, ages nine-months-old, six-years-old, and four-years-old, were left unattended, and that this was an ongoing problem about which he had confronted plaintiff McConnell previously.  Durand also told defendant that he was afraid for the children's safety.  T. Chapman observed that the children were dirty and wearing dirty clothes.  Both minor female plaintiffs confirmed that they had been left alone, and female plaintiff J.M. told defendant that

34

her parents always left her alone and that she was afraid.  When
T. Chapman interviewed McConnell, she informed him that there was
a propane leak in the house, a fact later confirmed by James
McConnell.  A history search in the child welfare computer system
revealed that the McConnell family had prior referrals.  T.
Chapman's interview with A.B. and A.B's principal revealed
numerous unexplained absences and tardiness within an eight month
period.  Furthermore, male plaintiff A.B. stated in his interview
with Stevenson-Hibbs that James McConnell had previously poured a
bucket of water over his head, grabbed him by the neck, threw him
against the wall, threatened him with a drill, spanked him so
hard that it left bruises, and, the day before, struck him in the
face and left a cut around his eye.  That same afternoon, the
minor plaintiffs were detained and taken into protective custody.

     In support of their claims, plaintiffs attempt to offer as
evidence a memo, allegedly written by defendant T. Chapman to his
supervisor, in which defendant admits that he was negligent in
his removal of the children.  (Ex. A to Ex. 16 to Hearne Decl.).
Exhibit A purports to be this memo, dated and written on Lassen
County Health and Human Services Department letterhead, from T.
Chapman to Bill Jost.  The memo identifies both the author and
recipient and contains a signature above T. Chapman's name.
However, this proffered evidence lacks foundation because
plaintiffs have failed to submit an affidavit from T. Chapman
stating that he wrote the memo.  See Orr v. Bank of America, 285
F.3d 764, 777 (9th Cir. 2002) (finding that a memo submitted in
support of summary judgment was inadmissible because plaintiff
had failed to submit an affidavit from the alleged author that he

35

had in fact authored the document). Rather, plaintiffs attempt
to authenticate this memo through the declaration of Deborah
Henson, a CPS supervisor who was allegedly copied on the memo.
(Ex. 16 to Hearne Decl.). Henson's declaration does not lay a
foundation for Ex. A because Henson neither wrote the memo nor
witnessed T. Chapman do so. See id. Further, defendant T.
Chapman has submitted the declarations of two experts, both of
whom opine that the purported memo is not genuine. (Decl. of
David S. Moore, filed May 8, 2007; Decl. of Alan M. Perlman,
filed May 8, 2007). Plaintiffs offer no evidence that supports
the authenticity of this memo. Therefore, the purported memo is
not admissible evidence, and the court will not consider it in
ruling upon the motions for summary judgment.

Defendants contend that T. Chapman had reasonable cause to
believe that male plaintiff A.B. was being physically abused by
James McConnell. See Lebbos, 348 F.3d at 827 (finding that the
defendant social worker did not violate the plaintiffs'
constitutional rights by detaining the child prior to her
detention hearing based upon observation of redness, the child's
complaints of pain, and her father's alleged alcohol abuse and
general neglect). A.B. made numerous allegations of such abuse
to a Susanville police officer and defendant. A.B. also had a
cut around his eye that was consistent with his assertion that
James McConnell had slapped him the day before and cut him with
the silver ring he wore.

Plaintiffs contend that a professional should have
recognized that many of A.B.'s statements were exaggerations.
However, plaintiffs provide no evidence to support this

1   assertion.[29]   Moreover, the court finds problematic that

2   plaintiffs' unsupported argument seems to imply that social

3   workers should not take allegations of physical abuse from a

4   seven-year-old seriously, but instead, should assume that he is

5   exaggerating.  See Parkes, 345 F. Supp. 2d at 1083 (rejecting the

6   plaintiffs' argument that defendant social worker should not have

7   believed the children's allegations of sexual abuse).  Plaintiffs

8   also contend that McConnell reported that A.B. had the scar for

9   some time.  There is no evidence that this report was made to T.

10  Chapman prior to the detention; the evidence cited to by

11  plaintiffs were statements made by McConnell at the juvenile

12  court proceedings.

13      However, plaintiffs also contend that the allegations that

14  James McConnell was abusive did not justify removing the children

15  from plaintiff McConnell's custody because he offered to leave

16  the residence so that the children could return home with their

17  mother.  Defendant T. Chapman does not remember James McConnell

18  making this offer, but contends that exigent circumstances still

19  existed for the pre-hearing detention of the children.  Defendant

20  asserts that the information regarding a propane leak in the

21  house, coupled with McConnell's reported history of leaving the

22  children home unattended, demonstrated that the children were at

23  risk of an immediate threat of serious bodily injury if left in

24  their mother's custody.

25  _____

26      [29]   To the extent that plaintiffs seek to offer the
    deposition testimony of Ann Burgess as support for this point,
27  Burgess testified that she was only offering her expert opinion
    as to the impact of separation of a mother and her children, not
28  whether the removal was the appropriate decision.  (Deposition of
    Ann Wolbert Burgess ("Burgess Dep.") at 27:22-28:17).

37

1   "[W]hether reasonable cause to believe exigent circumstances

2   existed is generally a question of fact for the jury." Parkes,

3   345 F. Supp. 2d at 1089; see Mabe, 237 F.3d at 1108.  As such,

4   "summary judgment in favor of the defendant[] is improper unless,

5   viewing the evidence in the light most favorable to the

6   plaintiffs, it is clear that no reasonable jury could conclude

7   that the plaintiffs' constitutional rights were violated." Mabe,

8   237 F.3d at 1108 (quoting Wallis, 202 F.3d at 1138).  Based upon

9   the circumstances presented in this case, there exists a material

10  question of fact whether the minor plaintiffs were at a risk of

11  an immediate threat of serious bodily harm if left with their

12  *mother* and therefore, a triable issue regarding whether defendant

13  T. Chapman violated plaintiffs' constitutional rights by

14  detaining the children without a warrant.  See Parkes, 345 F.

15  Supp. 2d at 1088-89 (denying defendant social worker's motion for

16  summary judgment where she detained the children based upon

17  allegations of sexual abuse against the father and because of her

18  concerns that the mother would not be protective and might put

19  pressure on the children before the evidentiary hearing).[30]

20              **b.   Qualified Immunity**

21      Defendant T. Chapman argues that even if there are triable

22  issues relating to whether a constitutional violation occurred,

23  he is entitled to qualified immunity.  The doctrine of qualified

24  ─────────────

25      [30]    Defendant T. Chapman asserts that McConnell's plea of
    no contest to a violation of § 300(b) precludes her § 1983
26  claims.  However, plaintiff's plea did not address the exigency
    of the circumstances, the crux of plaintiffs' claims arising out
27  of the pre-hearing detention of the minor plaintiffs.  See Mabe,
    237 F.3d at 1110 (finding a triable issue of fact regarding the
28  social worker's pre-hearing removal, but granting defendant's
    motion for summary judgment regarding the post-hearing removal).

                              38

immunity protects from suit government officers who do not

knowingly violate the law.  Gasho v. United States, 39 F.3d 1420,

1438 (9th Cir. 1994).  "Qualified immunity shields a government

official from liability for civil damages if (1) the law

governing the official's conduct was clearly established; and (2)

under that law, the official objectively could have believed that

her conduct was lawful.  Mabe, 237 F.3d at 1106 (citing Ram v.

Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997).

The question of immunity generally is not one for the jury.

Qualified immunity "'is an immunity from suit rather than a mere

defense to liability' . . . .  [Therefore,] [i]mmunity ordinarily

should be decided by the court long before trial."  Hunter v.

Bryant, 502 U.S. 224, 228 (1991) (citation omitted).  However, if

a genuine issue of material fact exists regarding the

circumstances under which the officer acted, then the court

should make the determination after the facts have been developed

at trial.  Act Up!\Portland v. Bagley, 988 F.2d 868, 873 (9th

Cir. 1993).

The initial inquiry that the court must make to determine

whether an official is entitled to qualified immunity is whether,

"[t]aken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated

a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201

(2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Based upon the court's above analysis of defendant T. Chapman's

potential liability, the court has found that plaintiffs have

presented sufficient evidence for a reasonable juror to find that

a constitutional violation or violations did occur.

1      If, as in this case, a violation could be made out on a

2  favorable view of the parties' submissions, the next inquiry is

3  whether the constitutional right was clearly established.  <u>Id.</u>

4  This inquiry must be taken in the light of the specific context

5  of the case.  The contours of the right must be sufficiently

6  clear that a reasonable official would understand that what he is

7  doing violates that right.  <u>Id.</u>  However, this does not mean that

8  an official action is protected by qualified immunity unless the

9  very action in question has previously been held unlawful, but,

10  rather, in light of pre-existing law, the unlawfulness must be

11  apparent.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (internal

12  citations omitted).  The salient question is whether the law at

13  the time of the disputed conduct gave defendants "fair warning

14  that their alleged treatment of plaintiffs was unconstitutional."

15  <u>See</u> <u>id.</u> at 741.  There must exist a clearly established rule so

16  that "it would be clear to a reasonable officer that his conduct

17  was unlawful in the situation he confronted."  <u>Saucier</u>, 533 U.S.

18  at 205-06.

19      The conduct in question surrounds the detention of the minor

20  plaintiffs on May 5, 2003.  At this time, the law regarding the

21  fundamental right of parents and children to live together

22  without governmental interference was well established.  <u>Mabe</u>,

23  237 F.3d at 1107 (citing <u>Santosky v. Kramer</u>, 455 U.S. 745, 753

24  (1982)).  Parents and their children have a constitutional right

25  not to be separated without due process of law except in

26  emergencies.  <u>See</u> <u>id.</u> (citing <u>Stanley v. Illinois</u>, 405 U.S. 645,

27  651 (1972)).  In this case, because there is a triable issue of

28  fact regarding whether a reasonable social worker would have

believed that there were exigent circumstances requiring the
warrantless removal of the minor plaintiffs from the custody of
plaintiff McConnell, and because the law regarding warrantless
detention of minor children was clear, the court cannot find that
defendant T. Chapman is entitled to qualified immunity at this
stage of the litigation.  See Saucer, 533 U.S. at 205-06.

Therefore, defendant T. Chapman's motion for summary
judgment regarding plaintiffs' § 1983 claims arising out of the
pre-hearing detention of the minor children is DENIED.

### 2.  Post-hearing Detention

Plaintiffs also allege that defendant T. Chapman violated
their constitutional rights after the juvenile court hearing by
detaining the children pursuant to court order.  Specifically,
plaintiffs assert that defendant T. Chapman did not conduct the
investigation properly and that he submitted false evidence to
the juvenile court.

"[S]ocial workers are entitled to absolute immunity for the
initiation and pursuit of dependency proceedings, including their
testimony offered in such proceedings." Mabe, 237 F.3d at 1109
(holding that social workers were immune from plaintiff's
allegations that they did not conduct the investigation properly
and were allowed to submit false evidence to the juvenile court);
see Beltran, – F.3d –, 2007 WL 1805559 at *4 (holding that social
workers are afforded absolute immunity for their actions that are
"closely connected to the judicial process," including verified
statements in petitions files with a dependency court); Lebbos,
348 F.3d at 825-26 (holding that social worker was absolutely
immune for her actions in investigating and presenting evidence

41

1  to the dependency court).  "Moreover, social workers 'enjoy

2  absolute, quasi-judicial immunity when making post-adjudication

3  custody decisions pursuant to a valid court order."  <u>Id.</u>  Because

4  defendant's alleged conduct related to the initiation and pursuit

5  of dependency proceedings and the subsequent decisions pursuant

6  to a valid court order, T. Chapman is entitled to absolute

7  immunity as to plaintiffs' claims arising out of the post-hearing

8  detention of the minor children.

9       Plaintiff McConnell also contends that the post-hearing

10  detention was unlawful because she was denied independent

11  competent counsel and coerced into her no contest plea.  However,

12  plaintiff has failed to proffer any evidence that defendant T.

13  Chapman was responsible for the failure to appoint separate

14  counsel at the first detention hearing or for any alleged

15  coercion.  Rather, plaintiff states that "[t]he obvious conflict

16  was ignored by the Court and counsel."  (TUF ¶ 48).  This broad

17  contention, unsupported by any admissible evidence, fails to link

18  T. Chapman to plaintiff's alleged deprivation of due process.

19  Plaintiff also asserts that "the Court adopted the report of CPS

20  without comment . . . and without any requirement that the CPS

21  verify their findings and be cross examined regarding those

22  findings."  (Pls.' Opp'n to Mot. for Summ. J. of T. Chapman and

23  Lassen County, filed May 21, 2007, at 23).  Again, plaintiff has

24  failed to link any alleged unconstitutional conduct to defendant

25  T. Chapman.

26       Moreover, plaintiff's ineffective assistance and coercion

27  claims are barred by <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).  In

28  <u>Heck</u>, the Supreme Court held that where a complaint for damages

42

1  under § 1983 implicates the validity of a conviction, the

2  complaint must be dismissed unless the plaintiff can demonstrate

3  that the conviction has already been invalidated.  Id. at 486-87.

4  Plaintiff McConnell pled no contest to violating California

5  Welfare and Institutions Code § 300(b).  The California Supreme

6  Court has held that a plea of no contest under the California

7  Welfare and Institutions Code is equivalent to a defendant's plea

8  of guilty or nolo contendere in a criminal proceeding.  Troy Z.

9  v. San Diego County Dep't of Social Servs., 3 Cal. 4th 1170, 1181

10  (1992); see also Nuno v. County of San Bernardino, 58 F. Supp. 2d

11  1127 (C.D. Cal. 1999) (holding that fact that convictions were by

12  plea of nolo contendere did not affect application of rule of

13  preclusion).  The issue of whether plaintiff McConnell was

14  effectively represented or coerced implicates the validity of her

15  no contest plea.  As such, these claims are not cognizable under

16  § 1983.

17       Therefore, defendant T. Chapman's motion for summary

18  judgment regarding plaintiffs' § 1983 claims arising out of the

19  post-hearing detention of the minor plaintiffs is GRANTED.

20       **B.   California State Law Claims**

21       Plaintiffs allege that defendant T. Chapman was negligent in

22  his performance of mandatory duties and that he intentionally

23  inflicted emotional distress upon them.  Defendant T. Chapman

24  contends that plaintiffs' claims must be dismissed for failure to

25  timely comply with the California Tort Claims Act.

26       Claims relating to personal injury must be filed no later

27  than six months after the accrual of the cause of action.  Cal.

28  Gov't Code § 911.2.  Plaintiff McConnell filed her tort claim on

43

December 16, 2004, and the minor plaintiffs filed their claims on
January 21, 2005.  All plaintiffs named defendant T. Chapman in
their claims.  However, defendant T. Chapman had nothing more to
do with the McConnell family's CPS case after September 29, 2003,
more than a year before plaintiffs' claims were filed.  As such,
plaintiffs failed to comply with the California Tort Claims Act.

Plaintiffs argue that the action against defendant T.
Chapman did not accrue until November 2004 when plaintiff
McConnell and the minor plaintiffs were reunited; plaintiffs
argue that the tortious conduct continued until they were
reunited.  In essence, plaintiffs attempt to apply the continuing
violation doctrine to the timely filing requirement of the
California Tort Claims Act.  Plaintiffs cite no authority for the
application of this doctrine to the California Tort Claims Act.
However, even if this doctrine could apply, plaintiffs have not
presented evidence that defendant T. Chapman continued to violate
their rights after September 29, 2003.[31]  The continuing
violation doctrine does not apply where the alleged defendant
responsible for the continuing offensive conduct was not the same
throughout.  See Erickson v. West, 178 F.3d 1299 (9th Cir. 1999)
(holding that the continuing violation doctrine did not apply
where the alleged discriminatory decisions were made by four
different supervisors).

---

[31]    At best, plaintiffs assert that defendant T. Chapman
and CPS failed to prepare a case plan until August 2003 and that
this plan was updated.  However, it is undisputed that T. Chapman
had nothing more to do with the McConnell family's CPS case after
September 2003.  (TUF ¶ 60).  Therefore, defendant T. Chapman
cannot be held liable for the failure to update the case plan
after he was no longer the social worker for the McConnell
family.

1    Plaintiffs also assert that they were not required to submit
2    a claim for defendant T. Chapman's breach of mandatory duties.
3    In support of this contention, plaintiffs cite only to a
4    California Government Code section that does not exist,
5    California Government Code § 916.  Furthermore, the court can
6    find no authority for plaintiff's assertion that they were not
7    required to submit a claim.  <u>Cf.</u> <u>Tapia v. Alameida</u>, 03-CV-5422,
8    2006 WL 3457214, at *2 (E.D. Cal. Nov. 30, 2006) (dismissing the
9    plaintiff's claims for breach of a mandatory duty for failure to
10   comply with the California Tort Claims Act) (adopted by <u>Tapia v.</u>
11   <u>Alameida</u>, 03-CV-5422, 2007 WL 499637, at *1 (E.D. Cal. Feb. 12,
12   2007)).

13   Therefore, because plaintiffs have failed to comply with the
14   California Tort Claims Act, defendant T. Chapman's motion for
15   summary judgment regarding plaintiffs' California state law
16   claims for breach of mandatory duties and intentional infliction
17   of emotional distress is GRANTED.

18   **IV.  Defendant Lassen County**

19   Plaintiffs also bring claims against defendant Lassen County
20   under 42 U.S.C. § 1983 for violations of their Fourth and
21   Fourteenth Amendment rights and under California state law for
22   negligence in failing to fulfil a mandatory duty and intentional
23   infliction of emotional distress.

24   **A.    42 U.S.C. § 1983**

25   Under <u>Monell</u> and its progeny, a plaintiff may hold a
26   municipality liable under section 1983 if his injury was
27   inflicted pursuant to a County's policy, regulation, custom, or
28   usage.  <u>Chew v. Gates</u>, 27 F.3d 1432, 1444 (9th Cir. 1994) (citing

1   <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91, 694

2   (1978)).   To establish liability, a plaintiff must show

3       (1) she was deprived of a constitutional right; (2) the
        County had a policy; (3) the policy amounted to a
4       deliberate indifference to her constitutional right;
        and (4) the policy was the "moving force behind the
5       constitutional violation."

6   <u>Mabe</u>, 237 F.3d at 1110-1111 (quoting <u>Van Ort v. Estate of</u>

7   <u>Stanewich</u>, 92 F.3d 831. 835 (9th Cir. 1996)).

8       In their opposition, plaintiffs contend that defendant

9   Lassen County had a long standing policy of operating a non-

10  compliant CPS as standard operating procedure.   Specifically,

11  they assert that social workers failed to make face to face

12  contact with the children in foster care.   In support of their

13  arguments, plaintiffs submit only inadmissible evidence.

14      First, plaintiffs attempt to submit Exhibit 10, which

15  purports to be true and correct copies of "pertinent parts of the

16  Grand Jury Reports of Lassen County, public documents published

17  by the Grand Jury of Lassen County, and a summary also published

18  by the Grand Jury of Lassen County."   (Hearne Decl. ¶ 13).   The

19  courts review of the documents submitted in Exhibit 10 reveals at

20  least four different documents: (1) a document with the heading

21  "Consolidation of Grand Jury Reports from 1989 to 2003 in Regards

22  to Child Protective Services"; (2) a document with the heading

23  "Report of Findings, Lassen County, On-site Review, May 19 and

24  20, 2004"; (3) a document with the heading "California's Child

25  and Family Services Review County Self-Assessment"; and (4) a

26  document with the heading "Review of Lassen County CWS by Gary

27  Kupfer."   Plaintiffs attempt to authenticate all of these

28  ///

documents through the declaration of Treva J. Hearne ("Hearne"),
plaintiffs' counsel.

Hearne cannot properly authenticate the documents in Exhibit
10.  She does not attest that she wrote the documents or that she
witnessed who wrote the documents.  <u>Orr</u>, 285 F.3d at 777.  Nor
are any of the documents signed.  <u>Id.</u>  Further, Hearne has not
identified who produced the documents and defendant Lassen County
has not admitted to producing these documents.  <u>Id.</u>

To the extent that plaintiffs attempt to argue that these
documents are self-authenticating, plaintiffs are mistaken.  <u>See</u>
Fed. R. Evid. 902 (West 2007).  None of the documents are
certified copies of public records.  <u>See</u> Fed. R. Evid. 902(4).
However, plaintiffs implicitly argue that these documents are
"official publications" of the Grand Jury of Lassen County,
(Hearne Decl. ¶ 13), and thus self-authenticating pursuant to
Rule 902(5) of the Federal Rules of Evidence.  Rule 902(5)
provides that "[b]ooks, pamphlets, or other publications
purporting to be issued by public authority" are self-
authenticating.  However, there is no indication that these
documents were official publications or that they were even
published by the Lassen County Grand Jury.  <u>Cf.</u> <u>United States v.</u>
<u>Williams</u>, 946 F.2d 888 (4th Cir. 1991) (holding that United
States Army Pay Tables were self-authenticating pursuant to Rule
902(5)); <u>United States v. Cecil</u>, 836 F.2d 1431, 1452 (4th Cir.
1988) (official government statistics are self-authenticating);
<u>Cherry Hill Vineyards, LLC v. Hudgins</u>, -- F. Supp. 2d --, 2006 WL
3791986 (W.D. Ky. Dec. 26, 2006) (Federal Trade Commission Staff
Report is self-authenticating).  None of these documents are

1  printed on letterhead or have any other identifying mark
2  demonstrating that they were produced by the Grand Jury.  None of
3  these documents are signed.  Two of these documents, the Report
4  of Findings from the On-site Review and the County Self-
5  Assessment, are stamped "DRAFT."  As such, the court cannot find
6  that the documents submitted in Exhibit 10 are self-
7  authenticating.  Therefore, they are inadmissible.

8      Moreover, even if the documents in Exhibit 10 were properly
9  authenticated, they are rank hearsay.  While Grand Jury Reports
10 may be admissible as an exception to the hearsay rule pursuant to
11 Federal Rule of Evidence 803(8), none of the documents submitted
12 in Exhibit 10 can be construed as a Grand Jury Report.  At best,
13 plaintiffs produce evidence purporting to be a "Consolidation of
14 Grand Jury Reports."  This document does not contain any
15 information indicating who prepared it or for what purpose, nor
16 is this document signed by any member of the Grand Jury.  The
17 other documents submitted by plaintiffs are a county self-
18 assessment, a report submitted by Gary Kupfer, and report of the
19 on-site review conducted by Children's Services Operation Bureau.
20 Plaintiffs fail to offer any argument as to what hearsay
21 exception would allow these documents to be offered for the truth
22 of the matter asserted.  Therefore, they are inadmissible.

23     Second, plaintiffs attempt to introduce as Exhibit 11 a
24 letter and an attached report purportedly from Barbara Eaton,
25 Chief of the Children's Services Operations Bureau, to Mr. Thomas
26 Keefer of the Lassen County Department of Health.  Plaintiffs
27 attempt to authenticate this document through the declaration of
28 Hearne.  Again, Hearne does not attest that she wrote the

48

documents or that she witnessed the writing of the documents. Orr, 285 F.3d at 777.  Nor does she attest that she is familiar with Eaton's signature.  Id.  Further, there is no argument by plaintiffs that this document is self-authenticating.  Therefore, Exhibit 11 is inadmissible.

Furthermore, Exhibit 11 is also inadmissible hearsay. Plaintiffs implicitly contend that this letter falls within the business record exception, as Hearne attests that the letter was "prepared in the ordinary course of business." (Hearne Decl. ¶ 14).  However, plaintiff's counsel fails to proffer any information that would lead this court to find that she has the requisite personal knowledge to attest to what documents are produced in the ordinary course of business at the Children's Services Operations Bureau.

Finally, plaintiffs attempt to offer Exhibit 12, which is purportedly the Final Report on the Restructure of Lassen County Health and Human Services, signed by Thomas D. Gauthier. Plaintiffs attempt to authenticate this document through the declaration of Hearne.  Again, Hearne does not attest that she wrote the documents or that she witnessed who wrote the documents.  Orr, 285 F.3d at 777.  Nor does she attest that she is familiar with Gauthier's signature.  Id.  Further, there is no argument that this is document is self-authenticating. Therefore, Exhibit 12 is inadmissible.

Exhibit 12 is also inadmissible hearsay.  Plaintiffs also implicitly contend that this letter falls within the business record exception, as Hearne attests that the letter was "prepared in the ordinary course of business."  (Hearne Decl. ¶ 15).

However, plaintiff's counsel again fails to proffer any information that would lead this court to find that she has the requisite personal knowledge to attest to what documents are produced in the ordinary course of business by the Chief Administrative Officer.

Therefore, because plaintiffs have failed to adduce any admissible evidence to substantiate their claims that defendant had a policy of non-compliance, defendant Lassen County's motion for summary judgment regarding plaintiffs § 1983 claims is GRANTED.

**B.   California State Law Claims**

Plaintiffs allege that defendant Lassen County was negligent in its performance of mandatory duties and that it intentionally inflicted emotional distress upon them.  Defendant Lassen County contends that plaintiffs' claims must be dismissed for failure to timely comply with the California Tort Claims Act and because there is no basis for defendant Lassen County's liability.

Plaintiffs argue that the action against defendant Lassen County did not accrue until November 2004 when plaintiff McConnell and the minor plaintiffs were reunited; plaintiffs argue that the tortious conduct continued until they were reunited.  In essence, plaintiffs attempt to apply the continuing violation doctrine to the timely filing requirement of the California Tort Claims Act.  Plaintiffs cite no authority for the application of this doctrine to the California Tort Claims Act. However, even if this doctrine could theoretically apply to the California Tort Claims Act, plaintiffs have not alleged circumstances that would justify the application of the doctrine

in this case; rather, plaintiffs' claims are based on discrete
instances of alleged misconduct.   See Cherosky v. Henderson, 330
F.3d 1243, 1246 ("[D]iscrete discriminatory acts are not
actionable if time barred, even when they are related to acts
alleged in timely filed charges.") (quoting Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 122 (2002)).   In their complaint,
plaintiffs allege discrete mandatory duties that were allegedly
not fulfilled by defendant Lassen County.   (See Compl. ¶104).
Likewise, their allegations regarding intentional infliction of
emotional distress arise out of specific instances of misconduct.
(See Compl. ¶¶ 85-88).   As such, their claims are only timely
where such acts occurred during the limitations period.   See
Cherosky, 330 F.3d at 1246.   Because plaintiff McConnell filed
her claim on December 16, 2004, to be actionable, the conduct
giving rise to her state law claims must have occurred after June
16, 2004.   Because the minor plaintiffs filed their claims on
January 21, 2005, the conduct giving rise to their state law
claims must have occurred after July 21, 2005.

Plaintiffs allege that defendant Lassen County violated §
309 of the Welfare and Institutions Code by failing to place the
minor plaintiffs with a relative after being taken into temporary
custody and that such violation caused emotional distress.[32]
Such a violation occurred in May 2003 when Lassen County CPS
detained the children without a warrant.   After the juvenile

_____

[32]   In their briefings, the parties fail to discuss with
any particularity the basis for plaintiffs' tort claims.   For the
sake of completeness, the court analyzes each statutory basis for
defendant Lassen County's tort liability as set forth in
plaintiffs' complaint.   (See Compl. ¶¶ 83-106).

court hearings in May and June 2003, in which the Lassen County
Juvenile Court ordered the detention of the minor plaintiffs, the
minor plaintiffs were no longer in temporary custody as set forth
in the statute.  Therefore, this conduct falls outside the
limitations period and is not actionable.

Plaintiffs also allege that defendant Lassen County failed
to prepare a case plan within sixty days of the initial removal
of the children in May 2003 or by the date of the dispositional
hearing as required by Welfare and Institutions Code § 16501.1
and that such failure caused them emotional distress.  It is
undisputed that the case plan was filed on August 12, 2003.  As
such, any claim arising out of the alleged belatedly filed case
plan accrued in or around the summer of 2003.  Therefore, this
conduct falls outside the limitations period and is not
actionable.

Plaintiffs further allege that defendant failed to fulfill a
duty under California Welfare and Institutions Code by failing to
provide family preservation services.  As previously addressed in
ruling on defendant Lassen County's motion to dismiss, to bring a
tort claim against a government entity in California, liability
must be based on statute.  <u>County of Los Angeles v. Superior
Court</u>, 102 Cal. App. 4th 627, 637 (2002).[33]  Section 16500.5
provides that the Legislature "declares its intent to encourage
the continuity of the family unit" by providing family
preservation services, supportive services for children, and

---

[33]    The court previously found that § 16500.5 did not
create a mandatory duty.  However, for the sake of completeness,
the court reincorporates its finding in this analysis.

52

counseling and family support services.  Cal. Welf. & Inst. Code § 16500.5 (West 2007).  Even if the conduct of defendant occurred during the limitations period, this declaration of legislative intent does not impose a mandatory duty upon defendant Lassen County.  "An enactment does not create a mandatory duty if it merely recites legislative goals and policies that must be implemented through a public agency's exercise of discretion." County of Los Angeles v. Superior Court, 102 Cal. App. 4th 627, 639 (2002) (citing Wilson v. County of San Diego, 91 Cal. App. 4th 974, 980 (2001)).  Section 16500.5 merely sets out the intent of the legislature to encourage the continuity of the family unit by providing support services that the agency must implement through its discretion.  As such, this section does not impose a mandatory duty upon defendant Lassen County and thus, there is no basis for tort liability arising out of this section.

Finally, plaintiffs allege that Lassen County failed to comply with Welfare and Institutions Code § 387.  Section 387 imposes a duty to provide a noticed hearing before issuing "an order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution."  Cal. Welf. & Inst. Code § 387 (West 2007).  This section does not dictate the ultimate result, but merely imposes a mandatory duty to provide a noticed hearing before issuing such an order.  Further, at best, plaintiffs' claim under § 387 is premised upon defendant Lassen County's failure to file a supplement petition seeking to modify the juvenile court order that removed the minor children from

plaintiff McConnell.  Section 387 does not impose a duty upon the county or social worker to file such a petition where a juvenile court has ordered that the children be detained in the agency's custody and placed at a suitable place or home.  <u>In re Cynthia C.</u>, 58 Cal. App. 4th 1479, 1490 (holding that the defendant County Social Services Agency had no duty to file a § 387 petition where the juvenile court ordered that the agency remove the child to a home it deemed safer and more suitable); <u>see also</u> (Lassen County Order of Detention, Ex. A to Def. Griffith's Request for Judicial Notice, filed May 8, 2007) (ordering that the minor plaintiffs be placed in the custody of Lassen County CPS and detained at a suitable place or home).[34]  As such, under the circumstances in this case, defendant Lassen County did not have a mandatory duty to file a § 387 petition and obtain a court order.  Thus, there is no basis for liability pursuant to this statute.

Therefore, for the reasons set forth above, defendant Lassen County's motion for summary judgment regarding plaintiffs' state law claims is GRANTED.[35]

///

///

---

[34]   In analyzing defendant Lassen County's claim, the court takes judicial notice of the motion for summary judgment filed by defendant Loel Griffith and the exhibits submitted in support thereof.

[35]   To the extent that plaintiffs seek to hold defendant Lassen County liable on a theory of respondeat superior, for the reasons set forth above in the court's analysis of plaintiffs' state law claims against defendant Loel Griffith and defendant Terry Chapman, plaintiffs' state claims against Lassen County similarly fail.

**V.   Defendant Environmental Alternatives**

Plaintiff bring claims against defendant Environmental Alternatives ("EA") under California state law for negligence and breach of contract.[36]   Defendant EA contends that summary judgment should be granted because it did not breach any of its duties to plaintiffs.[37]

**A.   Negligence**

In their complaint, plaintiffs allege that defendant EA was negligent because it "knew or had reason to know that a prior complaint had been made against the Defendant Barbara Coy for failure to protect another minor child placed in her home as a foster child against the physical and sexual abuse of her husband against that minor child." (Compl. ¶ 118).   Defendants argue that it did not have any knowledge that plaintiffs were at risk of harm because it had no notice of Hank Coy's deviant propensities to molest children.

The gravamen of plaintiffs' claim for negligence against defendant EA is that it negligently continued to certify the Coy home as a foster home in the face of foreseeable injury to the

_____

[36]   It is unclear from plaintiffs' complaint whether they also alleged a claim for intentional infliction of emotional distress against defendant EA.   The court does not address these allegations herein as plaintiff does not raise this claim in her opposition to the motions, and therefore, the court deems this claim waived.

[37]   Plaintiffs also assert that the court should not consider defendant EA's motions for summary judgment because the Amended Memorandum of Points and Authorities was filed late. However, the only change to the amended briefing was the deletion of one phrase and the insertion of a similar phrase as well as reformatting of the document to comply with the court's page limits.   Because no substantive changes were made to defendant's timely filed motion, plaintiffs' request is DENIED.

minor plaintiffs by Hank Coy.  (<u>See</u> Pls.' Opp'n to Def. EA's Mot. for Summ. J., filed May 21, 2007, at 3).  As such, plaintiffs have adequately pled a claim for negligence based upon defendant's misfeasance, which "exists when the defendant is responsible for making the plaintiff's position worse, i.e. defendant has created a risk."  <u>Weirum v. RKO Gen., Inc.</u>, 15 Cal. 3d 40, 49 (1975); <u>see also</u> <u>Jacoves v. United Merchandising Corp.</u>, 9 Cal. App. 4th 88, 114 n.16 ("Misfeasance is the improper performance of an act that is otherwise proper and nonfeasance is the nonperformance of an act that should be performed.").[38]

"Where the act complained of is one of misfeasance, the question of duty is governed by the standards of ordinary care." <u>Romero</u>, 89 Cal. App. 4th at 1091 (quoting <u>Weirum</u>, 15 Cal. 3d at 49).  California courts have applied a "policy-driven, multifactor weighing process for determining whether in a particular case a defendant owed a tort duty to a given plaintiff."  <u>Id.</u> (citing <u>Rowland v. Christian</u>, 69 Cal. 2d 108, 113 (1968)).  These factors are non-exclusive and generally include:

> (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the

---

[38]   In both their complaint and opposition to defendant EA's motion, plaintiffs' allegations and arguments are most accurately interpreted as asserting a claim for negligence based upon a theory of misfeasance.  As such, the court will only address this theory of negligence.  However, to the extent that plaintiffs sought to argue a negligence claim based upon a theory of non-feasance, such a claim would likely fail for the reasons set forth, *infra*, regarding the foreseeability of the harm to defendant EA.

burden to the defendant; (7) the consequences to the community of imposing a duty to exercise care with resulting potential liability for breach of that duty; and (8) the availability, cost, and prevalence of insurance for the risk involved.[39]

Id. (citing Parsons, 15 Cal. 4th at 472-73).  However, "[t]he most important factor remains foreseeability."  Margaret W., 139 Cal. App. 4th at 161.

Defendant EA argues that the harm to plaintiffs, the physical and emotional injuries arising out of Hank Coy's molestation of female plaintiff J.M. and alleged molestation of female plaintiff A.B., was not foreseeable to defendant. Defendant presents evidence that Barbara Coy did not observe any conduct or behavior by her husband that caused her to think that he could endanger the safety of the children or gave her reason to believe that he would engage in inappropriate sexual acts toward a child.  Defendant also presents evidence that Barbara Coy never informed anyone at EA or CPS that she thought her husband might be engaging in inappropriate sexual activity toward any child.  Most importantly, *plaintiffs admit that they are not aware of any evidence that EA had knowledge of the propensity of Hank Coy to engage in acts of sexual molestation or abuse of minors prior to the time that the minor plaintiffs were placed at the Coy home*.  (EUF ¶ 78).

Plaintiffs argue that defendant EA was negligent in placing the minor plaintiffs in the custody and care of a man and woman

---

[39]     Plaintiffs contend that there is general liability insurance policy that would cover this alleged negligence. However, plaintiffs fail to cite with any specificity what provision applies.  However, even if insurance is available, on balance, for the reasons set forth *infra*, plaintiffs' misfeasance claim fails.

over sixty who had physical and mental disabilities.  Plaintiffs
contend that Barbara Coy had to use a walker and that Hank Coy
had begun experiencing some signs of Alzheimer's disease, such as
lethargy, and did not hear very well.  However, plaintiffs
present no evidence that plaintiffs' alleged injuries arising out
of the molestation of female plaintiff J.M. and the alleged
molestation of female plaintiff A.B. can be attributed to the
Coys' age or disabilities.  Plaintiffs present no evidence that
age, Alzheimer's disease, lethargy, or hearing loss are
predictors of child molestation such that defendant EA should
have known that certification of the Coy home and placement of
the minor plaintiffs with the Coys would lead to this type of
alleged injury.

Plaintiffs also argue that defendant EA was negligent
because it did not require the Coys to report their medical
issues.  As set forth above, plaintiffs fail to proffer any
evidence that the Coys' medical issues caused the alleged
injuries.  As such, whether such issues were reported to EA is
irrelevant to this court's inquiry into the negligence claim
asserted in this case.  Moreover, plaintiffs fail to proffer
evidence that defendant EA did not require foster parents to
disclose such medical issues.  Plaintiffs only point to the
absence of a requirement in the "Parent-EA Agreement" and the
"Agency-Group Home Agreement."  Neither of these one-page
documents purports to set forth an all-inclusive statement of
EA's policies.  Rather, the "Parent-EA Agreement" refers to other
training requirements, a child's program plan, licensing
regulations, and state and federal laws and regulations, none of

1  which are set forth in the one-page agreement.   Therefore, the

2  absence of a requirement in these two one-page documents is

3  insufficient evidence that defendant EA did not require foster

4  parents to disclose medical issues.

5      Plaintiffs further argue that the injury was foreseeable

6  because there were other alleged incidents of abuse by the Coys

7  as foster parents.   Plaintiffs point to an allegation of spanking

8  at the Coy home in 2002.   Plaintiffs contend that this allegation

9  was not reported to Community Care Licensing ("CCL"), the state

10  agency responsible for investigating allegations of potential

11  abuse in foster homes certified by private foster family

12  agencies.   Plaintiffs fail to present any evidence to support

13  this assertion.   Rather, they misstate the deposition testimony

14  of Dan Switzer, an investigator for CCL, who testified that due

15  to the way records are kept at CCL, he was not aware whether this

16  complaints were referred to investigation.   (Dep. of Dan Switzer

17  ("Switzer Dep.") at 45:7-46:7).   He did not testify that it was

18  not reported to CCL by EA.   Moreover, defendants present evidence

19  that EA reported the incident to CCL and Lassen County CPS and

20  that no disciplinary action was taken.   (Decl. of Samuel James

21  Hardee in Supp. of Def. EA's Mot. for Summ. J. ("Hardee Decl."),

22  filed May 8, 2007, ¶ 7).   The Coys were subsequently counseled by

23  EA regarding this matter.   (Id.)   Defendants also present

24  evidence that such an incident did not warrant revocation of the

25  Coy foster family certification.   (Id.)   Finally, the spanking

26  incident did not involved any sexualized or criminal behavior by

27  Hank Coy.   (Id.)   Therefore, this reported allegation of a

28  spanking incident at the Coy home did not put EA on notice that

it should not certify the Coy home because of Hank Coy's deviant propensities towards children.

Plaintiffs also argue that defendant EA was negligent in its certification of the Coy home in light of the fact that one or more foster children at the Coy home in approximately 2002 had a bed-wetting problem.  Plaintiffs base their argument on the broad assertion that bed-wetting is necessarily indicative of sexual molestation, without any expert testimony to support that assertion.[40]  There is no evidence that sexual abuse was the cause of the childrens' bed-wetting problem or that it was even suspected.  Moreover, there is no evidence that sexual abuse by Hank Coy was the cause of the bed-wetting or even suspected.  As such, the fact that children who were in foster care at the Coy home had bed-wetting problems did not put defendant EA on notice that it should not certify the Coy home because of Hank Coy's deviant propensities.

Finally, plaintiffs argue that defendant EA failed to report behavior changes in female plaintiff J.M., such as touching another child inappropriately at school and kicking and spitting at her foster father.  Plaintiffs contend that EA was negligent in failing to identify these behaviors as signs of sexual abuse. Plaintiffs present evidence that in September 2003, defendant Coy spoke to Oliviera regarding J.M.'s behavior, such as striking and spitting on Hank Coy.  Oliviera never observed any of this

---

[40]   At best, plaintiffs cite to the deposition testimony of Dan Switzer, who stated that bed-wetting *could* be indicative of molestation.  (Switzer Dep. at 66:3-15).  Switzer did not testify that bed-wetting was necessarily a "red flag" for sexual molestation as argued by plaintiffs.

1  behavior.   Oliviera informed defendant that these behaviors

2  sounded like what a child would do if they had been molested.

3  Oliviera further informed defendant that she thought that the

4  children had probably been molested *before* they were placed in

5  defendant's care.   While this evidence may demonstrate that

6  defendant EA had notice that J.M. was exhibiting signs of

7  molestation, this information did not put defendant on notice of

8  when the molestation occurred or that Hank Coy was the

9  perpetrator.   Therefore, the change in female plaintiff J.M.'s

10 behavior did not put EA on notice that Hank Coy was molesting any

11 of the minor children.

12      Under the circumstances in this case, the consideration and

13 balance of the Rowland factors militates against finding that

14 defendant EA owed a duty of care to plaintiffs under principles

15 of ordinary negligence.   First, as set forth above, plaintiffs

16 have presented no evidence to support a reasonable inference that

17 defendant had notice that Hank Coy would sexually molest a child.

18 As such, the risk of the harm that occurred in this case was not

19 reasonably foreseeable, a critical aspect of imposing a legal

20 duty on defendant that informs many of the following factors.

21 See Romero, 89 Cal. App. 4th at 1092; see also Margaret W. v.

22 Kelley R., 139 Cal. App. 4th 141, 161 (2006) (finding that the

23 remaining Rowland factors could not overcome the lack of

24 foreseeability).

25      None of the parties dispute that at least one of the minor

26 plaintiffs was molested by Hank Coy.   However, where there is no

27 evidence that defendant knew the Coy home would be unsafe due to

28 Hank Coy's deviant propensities, there is only a tenuous

connection between defendant EA's conduct in certifying the Coy
home for foster care and the subsequent abuse of a foster child
by Hank Coy.  Further, because the conduct of Hank Coy was not
reasonably foreseeable, defendant's certification of the Coy home
was not morally blameworthy.  See id. at 1093.  This is
particularly true where the undisputed evidence demonstrates that
Oliviera documented 10 visits and at least six calls to the Coy
home between May 5, 2003 and September 29, 2003.  In response to
reports of changes in female plaintiff J.M.'s behavior, Oliviera
went to the Coy home and talked to the minor plaintiffs as she
had been trained to do.  Oliviera believed that the reason female
plaintiff J.M. was angry with Hank Coy was because she had been
suspended from school and took out her frustration on Hank Coy.
Oliviera also believed and discussed with T. Chapman that foster
children begin to act out after they start visiting their
biological parents and return to their foster parents.  As such,
the undisputed evidence demonstrates that defendant EA responded
to J.M.'s changes in behavior, despite that fact that it had no
prior notice of Hank Coy's deviant propensities.

Moreover, the policy of preventing future harm would not be
served by imposing liability in this case, where the risk of harm
to the children was not reasonably foreseeable by defendant.  See
id at 1093-94.  If foster family agencies are required to file a
suspected child abuse report or terminate placement each and
every time a child in foster care acts out at school or against a
foster parent, the foster care system would be unmanageable.
Children placed in the foster care system are inherently placed
in a highly stressful and emotional situation, arising out of

their removal from an equally stressful and likely dangerous situation.  These children may respond by acting out against their foster parents.  To require foster family agencies to immediately terminate such placements would add more chaos and instability to the lives of these children.  To require foster family agencies to submit vague and nonspecific suspected child abuse reports based upon isolated instances of hitting and kicking of a foster parent would substantially burden already overburdened law enforcement agencies, CCL, and county child protective agencies.  Therefore, as in this case, where the only indication of abuse that plaintiffs can point to are isolated instances of acting out after the foster home had been certified and without any prior knowledge of deviant propensities of a foster parent, public policy dictates against imposing liability.

As such, after consideration of the <u>Rowland</u> factors in the circumstances of this case, the court finds that defendant EA did not owe plaintiffs a duty of care under general negligence principles.  Therefore, defendant EA's motion for summary judgment regarding plaintiffs' negligence claim is GRANTED.

**B.   Negligence Per Se**

In their opposition, plaintiffs for the first time contend that defendant EA is liable for negligence per se for Oliviera's failure to report allegations of abuse pursuant to California Penal Code § 11165.9.  Even under liberal notice pleading standards, plaintiffs did not allege a claim for negligence in their complaint based upon defendant Oliviera's failure to report.  Rather, the crux of plaintiffs' claim is that defendant had knowledge of Hank Coy's propensity for abuse and continued to

1  certify the Coy home for foster care, which led to plaintiffs'

2  injuries.   Nowhere in plaintiffs' complaint is there an

3  allegation regarding defendant EA's failure to report.

4       Whether or not defendant EA or Oliviera properly reported

5  suspected child abuse after receiving information from Barbara

6  Coy or after observing behaviors of the minor plaintiffs is a

7  fact that has not changed since the filing of the complaint.   To

8  the extent that facts were obtained in discovery which led to the

9  assertion of this theory, plaintiffs do not identify when such

10  facts were obtained, nor do they contend that amendment of the

11  complaint was requested promptly after the plaintiffs obtained

12  such knowledge.   Therefore, plaintiffs have failed to demonstrate

13  "good cause" to add a claim based upon defendant Coy's alleged

14  failure to report.   Furthermore, even if such "good cause" could

15  be demonstrated, plaintiffs have failed to proffer any argument

16  that the interests of justice require granting plaintiffs leave

17  to amend their complaint at this late stage in the proceedings.

18  As such, the court does not consider the merits of plaintiffs'

19  negligence per se claim.

20       **C. Breach of Contract**

21       Finally, the minor plaintiffs contend that defendant EA

22  breached its contract with Lassen County CPS, to which they claim

23  they were intended third party beneficiaries.[41]   Plaintiffs'

24

25       [41]   It appears that defendant EA and Lassen County entered
26  into an "Agency-Group Home Agreement" despite the fact that the
   minor plaintiffs were placed in foster care, not in a group home.
27  As such, the terms of this contract are seemingly inapplicable.
   However, for the reasons set forth *infra*, plaintiffs' breach of
28  contract claim fails for plaintiffs' inability to proffer any
   cognizable argument or evidence.

opposition completely fails to respond to defendant EA's points
and authorities regarding the breach of contract claim.
Plaintiffs also fail to articulate what contractual term EA
allegedly breached. (EUF ¶ 79). However, construing plaintiffs'
woefully inadequate briefing in the light most favorable to them,
plaintiffs contend that defendant EA breached the contract
because no EA representative reported female plaintiff J.M.'s
change in behavior to Lassen County CPS. Plaintiffs' asserted
evidence in support of this claim, the deposition testimony of
Barbara Coy,[42] does not support this contention. Further, it is
undisputed that Oliviera spoke to T. Chapman at Lassen County CPS
regarding the change in J.M.'s behavior. (EUF ¶ 45). Therefore,
because plaintiffs have failed to articulate any cogent argument
or proffer any evidence in support of their claim, defendant EA's
motion for summary judgment regarding plaintiffs' claim for
breach of contract is GRANTED.

## CONCLUSION

Based on the foregoing analysis, the court makes the
following orders:

1.   Defendants Hanson, Dahle, Keefer, Pyle, and J.
     Chapman's Motion for Summary Judgment is GRANTED.

2.   Defendant Loel Griffith's Motion for Summary Judgment
     is GRANTED.

///

///

---

[42]   The court also notes the irony that the one piece of
evidence plaintiffs cite to is the deposition of Barbara Coy,
which they have continuously sought to have stricken as wholly
lacking in credibility.

3.   Defendant Terry Chapman's Motion for Summary Judgment:

 a.   regarding plaintiffs' § 1983 claims arising out of the pre-hearing detention of the minor children is DENIED.

 b.   regarding the remainder of plaintiffs' claims is GRANTED.

4.   Defendant Lassen County's Motion for Summary Judgment is GRANTED.

5.   Defendant Environmental Alternative's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

DATED: June 29, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

66